# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Sebastian Symeonides,

         Plaintiff

v.

Trump Ruffin Commercial, LLC, et al.,

         Defendants

Case No.: 2:23-cv-00854-JAD-MDC

**Order Regarding Otis Elevator Corporation's Motion for Summary Judgment and Related Filings**

[ECF Nos. 53, 54, 55, 78, 80]

      Sebastian Symeonides got stuck in a malfunctioning elevator at the Trump International Hotel in Las Vegas for 20 minutes on Valentine's Day 2022, which also happened to be his wedding day. So he sues Trump Ruffin Commercial LLC and its affiliated entities,[1] along with Otis Elevator Corporation for negligence and products liability.[2] His claims are based primarily on the opinions of his retained elevator-maintenance expert, John Koshak.

      Otis now moves for summary judgment on all claims[3] and seeks to exclude Koshak's opinions.[4] Symeonides concedes that his products-liability claim should be dismissed but argues that Koshak's opinions are not excludable and fully support his negligence claims. Trump Ruffin seeks to join in Otis's summary-judgment motion with additional substantive arguments,[5] an effort that Symeonides opposes.[6]

---

[1] I collectively refer to these entities as "Trump Ruffin."

[2] ECF No. 3-1.

[3] ECF No. 54.

[4] ECF No. 53.

[5] ECF No. 56.

[6] ECF No. 78.

1    While Koshak will not be permitted to offer the legal conclusions that Otis's actions

2    constituted a breach of contract or fraud, his opinions are otherwise not excludable, so I largely

3    deny Otis's motion to exclude Koshak's testimony.  Because Symeonides has shown that

4    Koshak's non-excluded testimony and other evidence in the record create genuine issues of

5    material fact to support Symeonides's negligence theories, I deny Otis's motion for summary

6    judgment on them.  And because Trump Ruffin's joinder in Otis's summary-judgment motion is

7    not a true joinder but instead a late substantive motion of its own, I grant Symeonides's motion

8    to strike it.  So this case proceeds to trial on Symeonides's negligence theories, but first I refer

9    the parties to the magistrate judge for a mandatory settlement conference.

**Background**

**A.    Symeonides and his friends got trapped in the hotel elevator for 20 minutes.**

12    Sebastian Symeonides got married in the penthouse on the 64th floor of the Trump

13    International Hotel in Las Vegas on Valentine's Day 2022.[7]  He was also a guest at the hotel and,

14    after a wedding rehearsal in the penthouse that morning, he and his friends got in public elevator

15    # 3 (PE3) and pushed the buttons to go back to their rooms to get ready for the wedding.[8]  But

16    the elevator malfunctioned, keeping the six passengers trapped inside it for about 20 minutes.[9]

17    PE3 was designed, installed, and maintained by the Otis Elevator Corporation.[10]

18    According to Symeonides and his friends, after the elevator doors closed, the elevator paused,

---

[7] ECF No. 54-3 at 134:3–16, 22–25; ECF No. 54-4 at 155:12–23; ECF No. 54-5 at 129:4–11.

[8] ECF No. 54-6 at 13:17–22, 15:11–20, 16:4–6, 12–15; ECF No. 54-4 at 52:11–16, 149:8–11, 150:10–11; ECF No. 54-5 at 46:4–16; ECF No. 54-6 at 18:3–11; ECF No. 54-9 at 179:1–4.

[9] ECF No. 54-7 at 6; ECF No. 54-8 at 57:18–22.

[10] ECF No. 54-7 at 77–78.

began to descend, and came to an abrupt stop near floor 62.[11]  Some say that the elevator came to an initial stop and started again.[12]  But each witness describes the manner in which the elevator moved differently.

While stuck in the elevator, Symeonides and one of his friends separately called 911.[13] The operator contacted the Clark County Fire Department (CCFD), which dispatched emergency services to the scene and alerted a Trump Ruffin security guard about the issue.[14]  Within 20 minutes of the first 911 call, Otis, CCFD, and the hotel-security staff safely freed PE3's trapped occupants from its stopping point just below the 64th floor.[15]  All of the passengers returned to their rooms and went to the wedding that evening as planned.[16]  Symeonides claims that he suffered a head injury during the incident, "affecting not only his physical, but his mental and emotional well-being."[17]

**B.    Symeonides sues for negligence and products liability.**

Symeonides filed this suit in state court against Trump Ruffin and Otis for negligence and products liability, but the case was removed to federal court based on diversity jurisdiction.[18] His liability theories are supported by his retained elevator-maintenance expert John Koshak, who opines that PE3 malfunctioned because the hoistway ropes stretched, resulting in the

---

[11] ECF No. 54-3 at 166:7–25; ECF No. 54-5 at 168:14–169:3; ECF No. 54-7 at 77.

[12] *See* ECF No. 54-3 at 141:20–24, 144:20–145:3, 146: 9–16; ECF No. 54-4 at 61:9–19, 62: 2–10, 65:4–18; ECF No. 54-5 at 48:2–21; ECF No. 54-6 at 19:1–15.

[13] ECF No. 54-3 at 167:9–16; ECF No. 54-4 at 88:2–16; ECF No. 54-5 at 71:6–7, 74:1–12.

[14] ECF No. 54-7 at 41:3–22.

[15] *Id.* at 93, 208.

[16] ECF No. 54-3 at 159:20–160:14; ECF No. 54-4 at 182:25–183:12; ECF No. 54-5 at 127:15–25.

[17] ECF No. 62 at 2.

[18] ECF No. 3.

1 lowering of the compensation sheave to the point where the switch tripped, which stopped the

2 elevator.[19]  Koshak further concludes that Otis's maintenance of PE3 was negligent for this

3 incident to occur,[20] as Otis employees must have failed to notice and fix the stretched ropes or

4 the lowering of the compensation sheave before the incident occurred.[21]

5 **C.    Defendants move for summary judgment and to exclude Koshak's testimony.**

6       Otis moves to exclude Koshak's report and testimony, arguing that it is not based in the

7 scientific method, plus it's speculative and irrelevant.[22]  Trump Ruffin filed a proper joinder in

8 that motion.[23]  Symeonides opposes the motion.[24]

9       Otis also seeks summary judgment.  It argues that the products-liability claim is time-

10 barred and fails as a matter of law; that Symeonides's main theory of negligent maintenance was

11 not pled in the complaint, and regardless the evidence doesn't support it; and that a res ipsa

12 loquitor theory of negligence is unavailable on this record.[25]  Trump Ruffin didn't file its own

13 motion for summary judgment by the dispositive-motion deadline; it instead filed a 138-page

14 "joinder" in Otis's motion four days after the deadline ran, raising its own substantive

15 arguments.[26]  Symeonides concedes that his products-liability claim should be dismissed but

16

17

18

---

[19] ECF No. 53-3 at 81:24–82:19.

[20] *Id.* at 82:6–14.

[21] *Id.* at 82:8–13.

[22] ECF No. 53.

[23] ECF No. 56.

[24] ECF No. 61.

[25] ECF No. 54.

[26] ECF No. 58.

otherwise opposes Otis's motion,[27] and he moves to strike Trump Ruffin's joinder.[28]  Finally, Otis moves to seal two documents submitted in support of its motion for summary judgment—its internal Maintenance Control Program (MCP) document and the transcript of the deposition of its own elevator expert, Jon Halpern.[29]

## Discussion

### I.    Otis has not established that the bulk of plaintiff's elevator expert John Koshak's opinions should be excluded.

Otis Elevator Corporation moves in limine to exclude Koshak's expert testimony.[30]  It argues that Koshak's opinion and proposed testimony fail to comply with the expert-testimony requirements under Federal Rule of Evidence (FRE) 702 and *Daubert v. Merrell Dow Pharmaceuticals*[31] because (1) Koshak's opinion that the compensation sheave caused the incident is not based on sufficient facts or data, (2) his opinion that Otis was negligent because it did not sufficiently inspect the elevator pit is based on speculation, and (3) his opinion is

---

[27] ECF No. 62.  Symeonides concedes in his response to Otis's motion for summary judgment that his "product[-]liability claim should be dismissed" and that "Otis . . . is not subject to liability under a premises[-]liability theory." *Id*. at 11.  Symeonides clarifies that "the claims against Otis are all negligence based." *Id*.  So I grant without further analysis the motion to the extent it seeks to dismiss the products-liability claim.

[28] ECF No. 78.

[29] ECF No. 55.

[30] ECF No. 53.

[31] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

irrelevant and unhelpful to a jury.[32]  Trump Ruffin Tower I, LLC joins in the motion,[33] and Symeonides opposes it.[34]

FRE 702 governs the admissibility of expert-opinion testimony.[35]  The analysis under the rule is "flexible," and district courts are instructed to apply the rule "with a liberal thrust favoring admission."[36]  When determining the admissibility of expert evidence in advance of trial, district courts undertake a "gatekeeping" function to ensure that the jury's consideration of evidence is not contaminated by irrelevant or scientifically unsupported testimony.[37]  Courts enjoy broad discretion over the discharge of this gatekeeping authority, "not only . . . in determining whether an expert['s] testimony is reliable, but also in deciding how to determine the testimony's reliability."[38]  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."[39]

---

[32] *Id.*

[33] ECF No. 56.

[34] ECF No. 61.  An evidentiary hearing—commonly referred to as "a *Daubert* hearing" in this context—is not required if the court "has an adequate record before it to make its ruling."  *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1138–39 (9th Cir. 2002).  Because the record in this case contains Koshak's curriculum vitae, ECF No. 76-4, expert reports, ECF Nos. 53-2 and 76-6, and 177-page deposition transcript, ECF No. 67-2, which permits this court to test the merits of the parties' arguments as to the admissibility of Koshak's expert opinions, I find that the motion to exclude is capable of resolution without a *Daubert* hearing.

[35] Fed. R. Evid. 702.

[36] *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (cleaned up).

[37] *See United States v. Alatorre*, 222 F.3d 1098, 1100–03 (9th Cir. 2000).

[38] *Elsayed Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002), *amended on other grounds by* 319 F.3d 1073 (9th Cir. 2007).

[39] *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (cleaned up).

1

2

### A.    Koshak's opinion is not excludable for his failure to use the scientific method.

3    As its first argument, Otis contends that Koshak's testimony is unreliable because

4  Koshak "did not use the scientific method" or "apply it reliably to determine that the

5  compensation sheave caused the incident."[40]  Then throughout its motion, Otis returns to the

6  theme that Koshak's opinions must be excluded because they are not based on "good science"

7  like "testable" conclusions or "peer-reviewed or published literature."[41]

8    Otis's argument ignores the nature of the opinion-evidence that Koshak provides.  There

9  are generally two approaches to determining whether expert-opinion testimony is sufficiently

10  reliable, and the nature of the testimony controls which one applies.  If the opinion is a scientific

11  one that can be reached by applying scientific principles, performing research, and evaluating

12  peer-reviewed studies, the factors from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[42]

13  typically guide the court's analysis.  But when "an expert offers non-scientific testimony,"[43] as

14  the Supreme Court recognized in *Kumho Tire Company v. Carmichael*,[44] "'reliability depends

15  heavily on the knowledge and experience of the expert, rather than the methodology or theory

16  behind' the testimony."[45]  And "the trial judge must have considerable leeway in deciding in a

17  particular case how to go about determining whether particular expert testimony is reliable."[46]

18

---

19  [40] ECF No. 53 at 11.

20  [41] *Id*. at 20.

     [42] *Daubert*, 509 U.S. 579.

21  [43] *Porter v. Martinez*, 68 F.4th 429, 444 (9th Cir. 2023).

22  [44] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

     [45] *Porter*, 68 F.4th at 444 (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir.

23  2000)).

     [46] *Id*. at 445 (quoting *Kumho Tire Co.*, 526 U.S. at 152).

1    Koshak's opinions are the *Kumho Tire* kind. They are not based on scientific

2    experiments or published studies, but rather founded upon his more than four decades of

3    specialized knowledge, training, and experiential practice in the elevator industry—primarily as

4    an elevator adjuster, serviceman, consultant, and research engineer.[47] As he put it during his

5    deposition, his opinions are based on his "fundamental elevatoring knowledge" from "being in

6    the elevator industry and on the mechanical[-]design committee and the suspension[-]means task

7    group, having adjusted elevators for the majority of [his] career."[48] He used "the scientific

8    method as part of" his work only "in very general terms," as "we're not trying to identify bosons

9    in a collider. I mean, you've got a car, you've got ropes, you've got accelerations, you've got

10    masses, and I understand all of those components."[49] So Koshak's opinions are not excludable

11    merely because they don't satisfy *Daubert*'s scientific factors.

12    **B.    Koshak's causation opinion is not based on cherry-picked evidence.**

13    Otis's second criticism is that Koshak's opinion that the compensation sheave caused

14    Symeonides's wedding-day incident is excludable because it is "founded on cherry-picked

15    evidence that feeds into Koshak's result-driven litigation opinion."[50] Koshak's theory depends

16    on a version of the story of how the elevator behaved during this event that he gleans from

17    Symeonides's deposition testimony. But Otis claims that the versions of events given by

18

19

20    [47] *See* ECF No. 76-4 (Koshak curriculum vitae); *see also Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) ("In this case, we find no error with the admission of this expert

21    testimony. The expert had over 30 years experience as an elevator engineer and was extremely familiar with the operation and appearance of this elevator stopping device.").

22    [48] ECF No. 67-2 at 76 (Koshak depo. at Bates No. 800:20–24) (cleaned up).

23    [49] *Id*. at 64 (Koshak depo. at 788:1–15) (cleaned up).

[50] ECF No. 53 at 11.

1  Symeonides and those provided in the depositions given by the other elevator occupants

2  "directly dispute[]" the interpretation that Koshak relies on.[51]

3    Otis's characterization of Koshak's work grossly understates the evidentiary bases for his

4  opinions.  His deposition testimony confirms that they are also based on a review of Otis's

5  business records;[52] attorney discussions, reports from emergency personnel, and building-

6  engineering incident reports,[53] including "after-production journals and logs, sign-ins";[54] and

7  "callback records indicating that they had adjusted the switch and, secondarily, that they had

8  ultimately shortened the ropes at a later date."[55]  "[T]he lack of evidence in this case,"

9  specifically the lack of records of work performed, is also a key foundation of Koshak's

10  opinions.[56]  So I cannot conclude that Koshak's opinions are based on cherry-picked evidence.

---

[51] *Id*. at 13.

[52] ECF No. 67-2 at 40 (Koshak depo. at 764:13–17) ("Q. Your opinions in this case are based on your interpretation, at least in part, of Otis's business records; correct?  A. Business records regarding Maintenance Control Program records, yes.").

[53] *Id.* at 45 (Koshak depo. at 769:4–9) ("Q. Where does your understanding of the incident facts come from?  A. Discussions with the attorney; later, typically deposition of the plaintiff; reports from emergency personnel, fire, police; building engineering incident reports.").

[54] *Id.* at 81 (Koshak depo. at 805:3–4).

[55] *Id.* at 67 (Koshak depo. at 797:15–20).

[56] *Id.* at 72–73 (Koshak depo. at 796–797) ("So you've got the Clark County Fire Department and the narrative from the security office—officer for Trump saying that Otis was on site, and there is no work record on 2/14 that was ever provided by Otis.  So the lack of evidence in this case implies to me that there probably—tripping a comp sheave switch is always a negligent maintenance condition, and I don't know why he didn't document it, or if he did document it, it wasn't produced, but it would have been inculpatory to Otis, and it violates code not to have a— a record of that work that was performed."); *id.* at 89 (Koshak depo. at 813:8–16) ("I believe that the missing ticket for February 14 was a ticket that likely the mechanic put the switch even higher to prevent—or even lower to prevent this false tripping or this—to prevent it from being actuated.  And that was a temporary fix until they could shorten the ropes a month and a half later because it takes time to schedule labor to shorten the ropes.  You don't just send the guy the next day."); *id.* at 91 (Koshak depo. at 814–815) ("since there were no records of the in-car stop switch or the final limit or any of the other EPDs or adjustment of the interlocks, then Occam's razor kicks in. . . .  And, in this case, it's the comp sheave switch").

The fact that the testimony of the other elevator riders may undermine the strength of Koshak's opinion is no basis to exclude it. Koshak explained at his deposition why Symeonides's description of the events supports his causation theory, noting that, based on Koshak's "knowledge and experience of what that feels like and 15 years of doing this kind of work, his description was consistent in [his] mind with the stretch and contraction of a steel wire rope after a sudden stop."[57] He elaborated that he did not read Symeonides's description "to mean that the elevator stopped and then moved again under control. [Symeonides] was simply describing the sequence of feeling that are consistent with the opening of an EPD, which supports the conclusion, in [Koshak's] opinion, that the comp switch, because of the later rope shortening, had in fact tripped, had required manual reset, and the fact that they were stuck in the elevator and required extraction by Otis, supports" that conclusion.[58] The fact that the testimony of other witnesses undermines this interpretation goes to weight, not admissibility. As the Ninth Circuit explained in *Primiano v. Cook*, "shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[59] "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'"[60]

---

[57] *Id.* at 55:5–9.

[58] *Id.* at 55–56 (Koshak depo. at 779–780).

[59] *Primiano*, 598 F.3d at 564, as amended (Apr. 27, 2010).

[60] *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Alaska Rent-A-Car v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)) (cleaned up).

### C.    Koshak's opinion that the compensation sheave should have been examined twice a year is based on specialized knowledge and experience.

A key opinion of Koshak is that the defect in the compensation sheave would have been apparent to Otis had it sent in a competent, qualified mechanic in to perform a proper inspection of the elevator pit twice yearly.  Otis contends that "[t]here is no foundation for" this opinion, which "is based only on his self-serving interpretation of the Code, maintenance records, and selected witness testimony," making it neither relevant nor reliable.[61]  It characterizes this opinion as "nothing but speculation" and says that "Koshak offers no evidentiary support for his assertion that Otis was required to inspect the pit twice a year."[62]

Again Otis grossly understates the record.  Otis highlights Koshak's deposition testimony that it's "Otis's call" how frequently it needs to inspect the compensation sheave, but it fails to mention his elaboration that this opinion is based on Code requirements.[63]  He testified that the Code contains "a list of components," including "age, usage, environmental[] condition, and all the metrics" that the maintenance company must take into consideration when determining the necessary frequency of sheave inspections.[64]  He then explained that he believes "you should probably go into the pit twice a year, minimum, particularly with high-rise, high-speed cars.  And [Otis's] system said, Go into the pit."[65]  "The preventive maintenance is to look there often enough to make sure you're not nearing the point where the comp switch would actually be

---

[61] ECF No. 53 at 15.

[62] *Id*. at 16.

[63] *See* ECF No. 67-2 (Koshak depo. at 860:25).

[64] *Id.* at 136 (Koshak depo. at 859:14–23).

[65] *Id*. at 137.

1    actuated, and assuring that the riding public isn't subjected to that emergency stop."[66]  That

2    opinion was further explained by the various tasks that needed to be completed during such a pit

3    visit.[67]  Koshak also stated that this requirement is "no different than what [his] MCP program

4    required."[68]  His deposition testimony demonstrates that his twice-a-year inspection-frequency

5    opinion is based on his extensive experience in elevator maintenance and specialized knowledge,

6    not mere speculation.

7

8        **D.**    **Koshak's opinion that Otis did not sufficiently examine the elevator is based on specialized knowledge and experience and is relevant and helpful.**

9           Otis offers the same criticism of Koshak's opinion that Otis's preventative maintenance

10   was insufficient: it's pure speculation.[69]  And yet again, this is an understatement of the record.

11   A review of Koshak's deposition testimony reveals that this opinion is based on the conditions of

12   the elevator and pit, which revealed extensive neglect; Koshak's experienced belief that the

13   inspections performed were too short to complete all required tasks;[70] plus the absence of

14   maintenance records that reflect key tasks were performed.[71]  Otis's criticism goes to weight, not

15   admissibility, and its vehicle to attack those bases is cross examination, not exclusion.[72]

16

---

17   [66] *Id.* at 140 (cleaned up).

18   [67] *Id.*  ("there were seven other things to do").

     [68] *Id.* at 139 (Koshak depo. at 863:3–5).

19   [69] ECF No. 53 at 17.

20   [70] ECF No. 67-2 at 125–35 (Koshak depo. at 849–59).

21   [71] *Id.* at 141–49 (Koshak depo. at 865–73).

22   [72] *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 662–63 (11th Cir. 1988) (noting in an elevator case that "[e]xpert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically.  Whether this logical basis has

23   been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility.  On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's

Otis also attacks Koshak's negligent-maintenance opinion as irrelevant and unhelpful. It first points out that his belief that the pit was not clean is based on an inspection conducted nearly two years after the incident, so it is factually unsound.[73] But the messy condition of the pit was just part of the foundation for Koshak's opinion that insufficient maintenance had been performed. And again, cross examination is the proper vehicle for challenging it.

### E.    But Koshak may not offer legal opinions unrelated to negligence.

Otis's final challenge to some of Koshak's opinions lands, however. It argues that Koshak should not be permitted to offer opinions that "Otis was contractually obligated to inspect the pit at least twice a year" or that Otis's maintenance records were "fraudulent."[74] The plaintiff has not established that Koshak is qualified to offer such legal opinions.[75] And even if they had, those contract-breach and fraud opinions are irrelevant in this negligence case, and "[e]xpert testimony [that] does not relate to any issue in the case is not relevant and, ergo, non-helpful."[76] So while the facts underlying those opinions are not excludable, Koshak will not be permitted to characterize those facts as "fraud" or a "breach" of a contractual obligation.

In sum, Koshak's motion to exclude Koshak's expert opinions is granted in small part: Koshak is precluded from offering the opinions that Otis "breached" a contractual obligation or committed "fraud." But it is denied in all other respects.

---

weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.") (internal citations omitted).

[73] ECF No. 53 at 23.

[74] *Id*. at 24.

[75] "Plaintiff acknowledges that Mr. Koshak will not characterize the records as 'fraudulent.'" ECF No. 61 at 28.

[76] *Daubert*, 509 U.S. at 591.

## II.    Symeonides has sufficiently pled a negligent-maintenance theory.

Otis contends that Symeonides can't pursue a negligent-maintenance theory of his case because he did not plead a negligent-maintenance claim in his complaint.  It aggressively asserts, "Make no mistake, Plaintiff did not and has not pled a claim for negligence based on negligent maintenance," just premises liability.[77]  This is a gross misrepresentation of the complaint.  The first cause of action, titled "Negligence," contains the allegation that "Defendants negligently maintained and controlled said real property and premises, and further negligently permitted a dangerous condition, not obvious or apparent to Plaintiff to exist thereon and further, did . . . negligently allow[]the Subject Elevator . . . to be in a condition dangerous and unfit for use . . . ."[78]  This was sufficient to put the defendants on notice that the plaintiff is pursuing a negligence-maintenance theory among others.

## III.    Genuine issues of material fact preclude summary judgment on the negligence theories.

Summary judgment on a negligence claim is appropriate when the defendant "negate[s] at least one of the elements of negligence."[79]  Those elements are: "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages."[80]  Otis argues that it is entitled to summary judgment as a matter of law on Symeonides's negligence claim against it because he cannot demonstrate these elements for two main reasons: (1) there is no admissible

---

[77] ECF No. 54 at 17.

[78] ECF No. 3-1 at 9, ¶¶ 14 and 14(d).

[79] *Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 153 (Nev. 2012); *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

[80] *Sanchez ex rel. v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1280 (Nev. 2009).

evidence that the compensation sheave caused the incident,[81] and (2) even there is, there is no

evidence that Otis had notice of an issue with the compensation sheave.[82]

### A.   A genuine dispute of material fact exists over whether the compensation sheave caused PE3 to malfunction.

Otis contends that "the undisputed testimony makes clear" that the compensation sheave

could not have caused the elevator stop.[83]  It relies on the malfunctioning elevator's movement

as described at the depositions of the passengers who were in the elevator during the incident,

and Otis characterizes those descriptions as consistently recounting that the elevator stopped,

restarted, and stopped again.[84]  It argues that, because the elevator restarted, the compensation

sheave could not have caused the incident because the experts agree that a compensation sheave

requires a manual reset for the elevator to start working again.[85]  So, Otis says, because there is

no evidence of a manual reset, the compensation sheave could not have caused the incident.[86]

But as Symeonides points out, the passenger accounts are not as uniform as Otis claims.

Some described starts and stops, others bouncing.[87]  Some described movement that could be

---

[81] ECF No. 54 at 18.

[82] *Id.* at 21.  Otis offers a third argument—that Koshak's opinions can't create genuine issues of fact because they are inadmissible.  That argument fails for the same reasons that I denied Otis's motion to exclude Koshak's testimony *supra*, so I don't address these points separately in the summary-judgment context.

[83] *Id.* at 18.

[84] *Id.* at 18–20.

[85] *Id.* at 20 (citing ECF No. 54-8 at 73:8–13; ECF 55-1 at 67:25–68:4, 78:8–12).

[86] *Id.*

[87] *See* ECF No. 63 n.1 (collecting deposition citations).

characterized as a restart, but others didn't.[88]  Exactly how the elevator moved that day will have to be decided by a jury.

Even if the passenger accounts can be read as consistent, how those perceptions translate into elevator operations is debatable.  Symeonides also notes that the elevator occupants weren't experts in the movement of elevators, so the way they described PE3's movements is subjective; for those descriptions to mean something, they need to be viewed through the elevator experts' lens.[89]  And as Koshak testified, though his lens, Symeonides's description that Koshak read is consistent with his theory that the compensation sheave tripped.  Koshak explained that based on his "knowledge and experience of what that feels like and 15 years of doing this kind of work, his description was consistent in my mind with the stretch and contraction of a steel wire rope after a sudden stop."[90]  "I did not read [his description] to mean that the elevator stopped and then moved again under control.  He was simply describing the sequence of feeling[s] that are consistent with the opening of an EPD, which supports the conclusion, in my opinion, that the comp switch, because of the later rope shortening, had in fact tripped, had required manual reset, and the fact that they were stuck in the elevator and required extraction by Otis, supports their . . . conclusion."[91]  So the way in which passenger accounts translate into elevator operations is the subject of a genuine dispute that precludes summary judgment on the basis of the passengers' testimony, as "weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."[92]

---

[88] *Id.*

[89] ECF No. 62 at 16–17.

[90] ECF No. 67-2 at 55–56 (Koshak depo. at 779–780).

[91] *Id.*

[92] *Anderson*, 477 U.S. at 255.

### B. Whether inspections and maintenance work met the standard of care is genuinely disputed.

Otis next argues that, even if there is an issue of fact as to whether the compensation sheave tripped, the documented history of inspections and preventive maintenance of the sheave demonstrate as a matter of law that Otis was not negligent in maintaining the elevator.[93]  It highlights that PE3 passed multiple state-mandated inspections and underwent preventive maintenance before the incident.[94]  Otis concludes that "[p]assing these inspections confirms the elevator operated properly and was code-compliant," and there is no evidence that the compensation sheave was not operating properly.[95]  Symeonides doesn't deny that the record shows that inspections happened, but he claims that a genuine dispute exists as to whether those maintenance tasks were competently performed.[96]  He points out that Otis failed "to identify which presentation tasks were performed" and that state inspections do not require examinations of the compensation sheave.[97]

 "[Q]uestions of negligence . . . are generally questions of fact," and they become questions of law "only when the evidence will support no other inference."[98]  And while the fact that PE3 underwent and passed state inspections and Otis mechanics performed maintenance procedures prior to the incident is some evidence that Otis met its obligations on this elevator, it's not the only evidence in the record.  Koshak pointed out at his deposition that the records of

---

[93] ECF No. 54 at 21.

[94] *Id.*

[95] *Id.*

[96] ECF No. 62 at 24.

[97] *Id.* at 19–20.

[98] *Joynt v. Cal. Hotel & Casino*, 835 P.2d 799, 801 (Nev. 1992).

what tasks were performed during those inspections and procedures is thin and, regardless, those records don't show that the compensation sheave itself was part of that work. He further opines that the amount of time that Otis claims it spent on maintenance work was grossly inadequate to cover compensation-sheave-related tasks.[99] The Otis mechanic who performed those tasks could not recall at deposition what he "did specifically that day."[100] Koshak also testified that Otis's maintenance records from two weeks before this Valentine's Day episode suggest that "the mechanic is indicating that" the elevator "needs rope shortening or—comp rope shortening."[101] So whether Otis was, or should have been, on notice of a problem with the compensation sheave before the accident remains subject to genuine dispute.

**VI.    Otis is not entitled to summary judgment on Symeonides's res ipsa theory.**

In his complaint, Symeonides pled a separate "claim"[102] for res ipsa loquitur, in which he theorizes that this elevator malfunction is the type that only occurs because of negligence.[103] Under Nevada law, "[a] res ipsa inference of negligence is permitted when" the plaintiff shows, among other things, that "the accident is one that does not ordinarily occur in the absence of negligence."[104] It is "a balancing doctrine, and while [the] plaintiff need not show the exact

---

[99] ECF No. 67-2 at 120 (Koshak depo. at 844:9–13).

[100] ECF No. 71-1 at 99 (depo. of Herbert Ward, Jr. at 97:5–25).

[101] ECF No. 67-2 at 111–12 (Koshak depo. at 835–36) (referring to Bates Stamp DEF301).

[102] Res ipsa is not a "claim" but an element-substitute theory of negligence. *See, e.g.*, *Baisley v. Slade Indus., Inc.*, 2024 WL 3012568, at *11 (S.D.N.Y. June 13, 2024) ("Res ipsa loquitur is a doctrine that allows two elements of negligence, duty of care and breach, to be inferred from the very nature of the accident, even without direct evidence of how any defendant behaved."); *Underwood v. O'Reilly Auto Parts, Inc.*, 671 F. Supp. 3d 1180, 1194 (D. Nev. 2023) ("The weight of authority in this District has found that res ipsa loquitur is a theory of liability or a method of establishing liability for negligence and not a separate cause of action.").

[103] ECF No. 3-1 at 10 (second cause of action).

[104] *Otis Elevator Co. v. Reid*, 706 P.2d 1378, 1380 (Nev. 1985).

cause of any injury, he must at least show that it is more probable than not that the injury resulted from the defendant's breach of duty."[105]  The doctrine allows a party "to infer negligence" when (1) the event is of a kind that "ordinarily does not occur in the absence of someone's negligence," (2) it is "caused by an agency or instrumentality within the exclusive control of the defendant" and (3) it was "not due to any voluntary action or contribution of the plaintiff."[106]  "It is a question of law whether res ipsa may apply to a given set of facts.  Whether or not the facts necessary to establish the elements of the doctrine are present, on the other hand, is a question of fact."[107]  Otis argues that Symeonides's res ipsa "claim is not viable" because such an incident can, and ordinarily does occur, without negligence" and "there is no evidence [that] Otis had exclusive control over the elevator at the time of the incident."[108]

Symeonides has shown that res ipsa applies to these facts.  Courts have recognized that "elevator malfunctions do not occur in the absence of negligence, giving rise to the possible application of res ipsa loquitur."[109]  And Koshak's testimony has confirmed that it is appropriate in this case because he testified at deposition that the odds of an elevator accident "if it's well maintained" are "very, very low, 1 in a million."[110]  He elaborated that "elevators don't

---

[105] *American Elevator Co. v. Briscoe*, 572 P.2d 534, 537 (Nev. 1977).

[106] *Woosley v. State Farm Ins. Co.*, 18 P.3d 317, 321 (Nev. 2001) (quoting *Bialer v. St. Mary's Hosp.*, 427 P.2d 957, 958 (Nev. 1967)).

[107] *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983) (internal citations omitted).

[108] ECF No. 54 at 27–28.

[109] *Baisley*, 2024 WL 3012568, at *12 (cleaned up); *see also e.g.*, *Ferguson v. Westinghouse Elec. Corp.*, 408 So. 2d 659, 660–61 (Fla. Dist. Ct. App. 1981) (noting in a sudden-stop case that "the doctrine of res ipsa loquitur is particularly applicable in elevator cab cases").

[110] ECF No. 67-2 at 43–44 (Koshak depo. at 767–768).

ordinarily suddenly stop."[111]  And he described the tripping of a compensation-sheave switch as "always a negligent maintenance condition."[112]  This testimony is enough for this court to conclude as a matter of law that this is a case in which the doctrine of res ipsa can apply.

Otis's second contention that this theory fails because "there is no evidence that Otis had exclusive control over the elevator at the time of the incident" presents a question of fact that will have to be decided by the jury.[113]  While the elevator did not belong to Otis and was situated inside the Trump International Hotel, the record contains evidence that Otis alone was responsible for its maintenance.[114]  For example, the Director of Security for the hotel testified at deposition that the work on the elevators was performed by "Otis exclusively."[115]  The same sentiment was voiced by the hotel's facilities manager.[116]  This is enough to create a genuine issue of material fact to prevent summary judgment on Symeonides's res ipsa theory of negligence.

---

[111] *Id*. at 43 (Koshak depo. at 768:24–25).

[112] *Id*. at 73 (Koshak depo. at 797:1–3).

[113] Otis also makes the point that "the record show[s] that Otis, Trump Ruffin, and the Clark County Fire Department all responded to the incident," ECF No. 54 at 28, as support for Symeonides's ability to establish the control element.  But its focus on this timing misses the point that the question is who was responsible for the elevator leading up to the malfunction, not after it.

[114] Regardless, the Ninth Circuit has described that "[r]es ipsa can apply . . . to multiple defendants who share responsibility for the probable cause of the accident."  *Ashland*, 711 F.2d at 1439 (emphasis omitted).

[115] ECF No. 73-1 at 156 (depo. of Clyde Turner at 154:2–5).

[116] ECF No. 76-3 at 14–15 (depo. of Daniel Tracey at 12:25–13:7); *see also* ECF No. 54-6 at 193: 22–24 (testimony of Cornelius Johnson, Jr., a Trump Ruffin security guard) ("Q: And was that because Otis worked on the elevators, not Trump personnel?  A: Otis.  Uh, that was Otis responsibility to me.").

**V.    Trump Ruffin's joinder in Otis's motion for summary judgment is an improperly framed, late dispositive motion of its own.**

The deadline to file a motion for summary judgment in this case was January 13, 2025.[117] Otis filed its motion that day.[118]  Four days later, the Trump Ruffin defendants filed a "Joinder to Otis Elevator Company's Motion for Summary Judgment."[119]  In all, that filing is 138-pages long, the first 11 of which are substantive argument.  Symeonides moves to strike this joinder as a "clear violation of this [c]ourt's scheduling order"[120] because it is "procedurally defective and untimely."[121]  He characterizes the joinder as "effectively a belated motion for summary judgment—thinly veiled as a joinder."[122]  Trump Ruffin responds that the joinder was not untimely, and regardless, it "does not provide any new information or argument that was not already discussed in [ ] Otis['s] [ ] motion for summary judgment."[123]

I find that Trump Ruffin's "joinder" is actually a summary-judgment motion of its own. It raises new arguments from a different liability perspective and does not merely incorporate by reference or adopt those of Otis.  Trump Ruffin adds new arguments about premises liability.[124] These new arguments are based on more than 100 pages of separate, additional exhibits that

---

[117] ECF No. 44.

[118] ECF No. 54.

[119] ECF No. 58.

[120] ECF No. 78 at 1.

[121] *Id.* at 2.

[122] *Id.* (cleaned up).

[123] ECF No. 85 at 6.

[124] ECF No. 54 at 16; ECF No. 58 at 4–5 (explaining how, "[i]n Nevada, a property owner owes a general duty to use reasonable care to keep the premises in a reasonably safe condition for use," and "[a] property owner is not liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care").

Trump Ruffin appends to its filing.  A party cannot avoid the dispositive-motion deadline by couching its own motion for summary judgment as a "joinder" to a timely one.  But that's what Trump Ruffin is attempting to do here.  So I grant Symeonides's motion to strike Trump Ruffin's joinder.[125]

## VI.    While Otis's MCP document should be sealed, the transcript of Jon Halpern's deposition shouldn't.

Finally, I address Otis's motion to seal two exhibits attached to its motion for summary judgment.  Relying on the magistrate judge's order granting the parties' stipulations for the production and use of confidential materials,[126] Otis argues that its Maintenance Control Program (MCP) document and the deposition transcript of Jon Halpern should be sealed because they are already designated as confidential and "sufficient compelling reasons exist to seal" them.[127]  No party filed a response to this motion.

The presumption of public access is not rebutted by the existence of a protective order.[128] "The public has a 'general right to inspect and copy public records and documents including judicial records and documents.'"[129]  "Although the common law right of access is not absolute, '[courts] start with a strong presumption in favor of access to court records.'"[130]  A party seeking to seal judicial records attached to dispositive motions can overcome the strong presumption of access by providing "sufficiently compelling reasons" that override the public policies favoring

---

[125] ECF No. 78.

[126] *See* ECF No. 26 (stipulated protective order).

[127] ECF No. 55.

[128] *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003).

[129] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).

[130] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

disclosure.[131]  "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records"[132] and "articulate a factual basis for each compelling reason to seal."[133]

I find that Otis has demonstrated compelling reasons for the MCP document to be sealed because it contains technical information about Otis's procedures for the inspection, maintenance, and repair of elevator equipment.[134]  Failing to maintain the seal on this document risks exposing trade secrets and intellectual property to competitors.  Keeping that information confidential is a compelling reason to seal, so I grant Otis's motion as to the MCP document.

But the same cannot be said of the Halpern deposition transcript.  Otis argues that this transcript must also be sealed because "his liability opinion is based on, relies upon, and defers to Otis Elevator's workmanship on the incident date as detailed by the inspection, repair, and service processes in the MCP used on that day."[135]  Otis further argues that the liability opinions that Halpern gives in his deposition are "inexorably intertwined with the MCP," so "his unsealed transcript will betray extremely sensitive trade secrets."[136]  But these generalized platitudes don't establish compelling reasons to seal Halpern's transcript, and my scan of it did not reveal any plain trade-secret information.  Plus, I note that a copy of that deposition transcript was filed on the record by the plaintiff, unsealed, more than three months ago, and Otis has taken no steps to

---

[131] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[132] *Id.* (citing *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).

[133] *Id.* (citing *Kamakana*, 447 F.3d at 1179; *Foltz*, 331 F.3d at 1136).

[134] *See* ECF No. 55-2 at 2–12.

[135] ECF No. 55 at 6.

[136] *Id.* at 7.

seal it.[137]  So I grant the motion as to the MCP document, but I deny it as to Halpern's deposition transcript.

## Conclusion

Accordingly, IT IS HEREBY ORDERED that:

- Otis Elevator Corporation's motion in limine **[ECF No. 53] is GRANTED in part and DENIED in part**:  Koshak will not be permitted to offer the legal conclusions that Otis's actions constituted a breach of contract or fraud, but his opinions are otherwise not excludable.

- Otis Elevator Corporation's motion for summary judgment **[ECF No. 54] is GRANTED as to the third cause of action for products liability, which is DISMISSED; it is DENIED in all other respects**, so this case proceeds on plaintiff's negligence claim, which may be proceed on theories of negligence, negligent maintenance, or res ipsa loquitur.

- Otis Elevator Corporation's motion to seal **[ECF No. 55] is GRANTED in part and DENIED in part**.  The Clerk of Court is instructed to **MAINTAIN THE SEAL on ECF Nos. 55-2, and 55-3, but not on ECF Nos. 55 or 55-1.**

- Sebastien Symeonides's motion to strike Trump Ruffin Tower I, LLC's joinder to Otis Elevator Corporation's motion for summary judgment **[ECF No. 78] is GRANTED**; **the Clerk of Court is directed to STRIKE ECF No. 58.**

- Otis Elevator Corporation's motion for leave to file a reply **[ECF No. 80] is GRANTED**. The court has considered the arguments raised in that reply brief.

---

[137] *See* ECF No. 68-1.

- This case is **REFERRED** to the magistrate judge for a MANDATORY SETTLEMENT CONFERENCE. **The parties' obligation to file their joint pretrial order is STAYED until 10 days after that settlement conference.**

_____
U.S. District Judge Jennifer A. Dorsey
May 28, 2025